UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SUNDANCE, INC., and
MERLOT TARPAULIN AND SIDEKIT
MFG. CO., INC.,

        Plaintiffs,

                                Case No. 02-73543

-vs-                                Hon: AVERN COHN

DEMONTE FABRICATING, LTD.;
QUICK DRAW TARPAULIN SYSTEMS,
INC. and WALTER DEMONTE,

        Defendants.

_____/


**AMENDED[1] DECISION AND ORDER ON POST-TRIAL MOTIONS RELATING TO
REASONABLE ROYALTY AND WILLFULNESS**

**I. Introduction**

      This is a patent case.  Plaintiffs Sundance, Inc. and Merlot Tarpaulin and Sidekit

Manufacturing Company, Inc. (collectively Sundance), the holders of U.S. Patent No.

5,026,109 (the '109 patent) covering a Segmented Cover System, sued DeMonte

Fabricating, Ltd. and Quick Draw Tarpaulin Systems, Inc. (collectively DeMonte) for

infringement of the '109 patent.  Liability was determined in a prior trial.

      After a four day trial on the issues of laches, willfulness, and damages, a jury

awarded Sundance $1,164,446.70 in damages based on a five percent (5%) royalty

applied to against $23,288,934.00 of infringing sales.  The jury found that the

---

      [1]This Amended Decision and Order replaces the Decision and Order filed July
31, 2007 and makes minor text changes on pages 5, 13 and 14.

infringement was willful and that Sundance was not guilty of laches.  A copy of the verdict is attached as Exhibit A.

Now before the Court[2] are two motions by DeMonte:

> DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER
> OF LAW TO ALTER JUDGMENT, OR FOR A NEW TRIAL
> ON THE ISSUE OF REASONABLE ROYALTY

> and

> DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER
> OF LAW THAT THEIR INFRINGEMENT WAS NOT
> WILLFUL OR FOR A NEW TRIAL

and a motion by Sundance:

> MOTION FOR ENHANCED DAMAGES DUE TO WILLFULNESS

While both of DeMonte's motions ask for a new trial as an alternative to a judgement as a matter of law, defendants' briefs do not discuss reasons for a new trial. The Court, in this decision, is only considering whether or not the verdicts on the issues of reasonable royalty and willfulness should stand.

For the reasons which follow, DeMonte's motions will be granted in part and denied in part.  The jury's verdict on the issue of reasonable royalty will stand; the jury's verdict on willfulness will be set aside.  Sundance's motion will be denied as moot.

## II.  Background and Trial

### A.

The background of the case is reflected in prior rulings of the Court as follows:

---

[2]Also before the Court is Sundance's Motion for Partial Summary Judgment Regarding Inequitable Conduct.  That motion is set for hearing and is not the subject of this decision.

MEMORANDUM AND ORDER GRANTING PLAINTIFFS'
MOTION FOR JUDGMENT AS A MATTER OF LAW OR
FOR A NEW TRIAL, filed September 20, 2006 (setting aside
jury verdict that the '109 patent was invalid).

MEMORANDUM AND ORDER DENYING DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW
REGARDING INFRINGEMENT, filed April 25, 2007
(upholding jury verdict that the '109 patent was infringed.)

The background of the trial is reflected in the JOINT PRETRIAL STATEMENTS

(Damages Trial), filed May 7, 2007.

**B.**

**1.**

The witnesses at trial witnesses for Sundance and a general description of their

testimony follows:

1.     Vincent J. Merlot, Jr., a co-inventor of the '109 patent, testified as to the

manufacture and sale of segmented tarpaulins for flat bed trailers as well as the

features and advantages of such tarpaulins.  He also testified as to a license Sundance

granted for the '109 patent and the features of DeMonte's Quick Draw™ system, the

infringing product.

2.     James R. Nanci, a co-inventor of the '109 patent, testified generally along

the lines of Merlot.

3.     Robert Overbaugh, an expert, testified as to the reasonable royalty

DeMonte should pay on its infringing sales of the Quick Draw™ system.  He particularly

testified as to the Georgia-Pacific[3] factors applicable to a reasonable royalty and why

_____

[3]See Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116
(S.D.N.Y. 1970).

the entire market value rule should be applied to the infringing sales of the Quick Draw™ system.

4. Walter DeMonte, a principal of DeMonte, testified in cross-examination regarding DeMonte's manufacture and sale of the Quick Draw™ system.

**2.**

The witnesses at trial for DeMonte and a general description of their testimony follows:

1. Walter DeMonte testified as to the history of flatbed trailer cover systems, the manufacture and sale of the Quick Draw™ system, the features of the Quick Draw™ system and the unit and dollar sales of the Quick Draw™ system. He also testified as to the components of the Quick Draw™ system and the lack of significance in segmentation in the sale of flatbed tarpaulins.

2. Tim P. DeMonte, son of Walter DeMonte, testified in a fashion similar to Walter DeMonte.

3. Daniel H. Bliss, a patent law expert, testified as to the nature and benefits of the '109 patent to DeMonte, and why the entire market rule should not be applied to the sales of the Quick Draw™ system. He did not testify regarding the Georgia-Pacific factors applicable to a reasonable royalty.

**C.**

Exhibits at trial included the '109 patent, Reexamination Certificates and the papers related to them, prior art patents, financial statements of DeMonte in various configurations including unit and dollar sales of the Quick Draw™ system, unit prices

generally including allocation of the dollar cost of various components, brochures and informational materials, license agreements, papers from Sundance's infringement suit against Aero Industries, Inc., truck statistics, photographs of Sundance's segmented tarpaulin and of the Quick Draw™ system. Particularly significant was Overbaugh's Georgia-Pacific analysis (Px 136) and opinion letters received by DeMonte (Dx 228(a) and Dx 228(b)).

**D.**

Conspicuously absent from the trial were witnesses from the truck industry who could have explained the significance of segmented versus non-segmented tarpaulins as covers for loads on flat bed trailers. Also, defendants did not request a special verdict or interrogatories, both of which might better explain the jury's verdicts. As one commentator has noted, special verdicts and interrogatories, while not perfect, are well-advised in jury patent trials given the fact-intensive nature of the proofs customarily offered and do much to dissipate the difficulties encountered in the global nature of a general verdict. See Kimberly A. Moore, Judge, Juries and Patent Cases - An Empirical Peek Inside the Black Box, 99 Mich. L. Rev. 365, 380 (2000); Kimberly A. Moore, Juries, Patent Cases, and a Lack of Transparency, 39 Hous. L. Rev. 779 (2002).

**III.  The Law**

**A.**

**1.**

The rules relating to a judgment as a matter of law under Fed. R. Civ. P. 50 have been described in the prior rulings of the Court following the liability trial and need not

be repeated except to note:

> The case law has developed a set of guidelines governing consideration of motions for JMOL, consistent with the Seventh Amendment guarantee. A court must (1) consider all the evidence, (2) in a light most favorable to the nonmovant, (3) drawing reasonable inferences favorable to the nonmovant, (4) without determining credibility of witnesses, and (5) without substituting its choice for that of the jury between conflicting elements of evidence. If, having done all this properly, it concludes that reasonable persons could not have reached a verdict for the nonmovant, it must grant the motion. The ultimate conclusion is really a two-step determination: (1) What facts are supported by substantial evidence? and (2) Do those facts support the legal conclusion necessarily drawn by the jury en route to its verdict? In the first step the judge avoids invasion of the jury's right to select reasonably from probative evidence and evaluate credibility. In the second the judge avoids miscarriage of justice by reaching a different legal conclusion when necessary.

Robert L. Harmon, <u>Patents and the Federal Circuit</u>, § 13.2(f)(I) (7th ed. 2005) (footnotes omitted).

## 2.

Because the Court set aside a jury's finding of invalidity following the liability trial and is now setting aside the jury's verdict of willfulness, some further comment is in order.

The judge is not obligated to accept a jury's verdict willy nilly as Harmon notes above. Long ago, in <u>Capital Traction Co. v. Hof</u>, 174 U.S. 1, 13-14 (1899), the Supreme Court said:

> "Trial by jury," in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of 12 men before an officer vested with authority to cause them to be summoned and impaneled, to administer oaths to them and to the constable

in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of 12 men in the presence and under the superintendence of a judge empowered to instruction them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence.

In a patent case, this proposition is especially pertinent given the complexity of the subject matter. In the Court's view, it is even more so when dealing with the issues of validity and willfulness. These issues are fact intensive and reflect a complexity of evidence based on testimony and documents and the inference to be drawn from them beyond those normally associated with the issues of infringement and damages. Therefore, a jury's verdict on the issues of validity and willfulness requires a closer and more critical review of a record than does the review of a jury's verdict on issues relating to infringement damages. This is true for two additional reasons. First, a higher standard of proof is required on the issues of validity and willfulness. Here willfulness must have been proven by the highly probable standard. This is another way of saying clear and convincing. Just recently, the Federal Circuit has defined clear and convincing "as evidence that 'place[s] in the ultimate fact finder an abiding conviction that the truth of the factual findings are highly probable.'" <u>Pfizer, Inc. v. Apotex, Inc.</u>, 480 F.3d 1348, 1360 n. 5 (Fed. Cir. 2007), citing <u>Colorado v. New Mexico</u>, 467 U.S. 310 (1984). Second,

Jury damage awards, unless the product of passion and prejudice, are not easily overturned or modified on appeal. That salutory approach is particularly applicable here, where the jury had every right to believe the evidence presented to it respecting a proper damage award sufficient to compensate the plaintiffs for the injury each suffered.

<u>Weinar v. Rollform Inc.</u>, 744 F.2d 797, 808 (Fed. Cir. 1984).

**3.**

At trial, Sundance relied mostly on circumstantial evidence to justify a favorable verdict on willfulness.  There was little direct evidence.  Rather, Sundance marshaled a congerie of facts from which it asked the jury to infer that DeMonte's infringement was willful and now wants the verdict sustained on the same basis.  What all of this means is that the Court must engage in a rigorous analysis of the evidence in deciding whether the verdict of willfulness should stand.

**B.**

As noted above, this was a jury trial.  The law of the case when a jury makes the decision is set out in the instructions.  Peculiarly, neither party mentions the instructions in their briefs even though there was no challenge to them.  Accordingly, a discussion of the law applicable to the two issues raised by DeMonte's motions should begin with a repeat of the instructions.  Regarding the issue of a reasonable royalty, no elaboration on what the jury was instructed is necessary.  As to the issue of willfulness, something further regarding the applicable law is appropriate given the complexities of the determination.

**C.**

Since the standards of proof differ as noted above on the issues, it is important to repeat how the jury was instructed:

> In any legal action, facts must be proved by a required standard of evidence, known as the "burden of proof."  In a patent case such as this, there are two different burdens of proof that are used.

8

The first burden of proof standard requires that, in order for a party to prevail on an issue, you must be persuaded that what the party seeks to prove is more probably true than not true.

The second burden of proof standard is a higher one. It requires that you must be persuaded that it is highly probable that what the party seeks to prove is true.

As previously stated, the burden of proof on the reasonable royalty issue is the former;

the burden of proof on the willfulness issue is the latter.

**D.**

As to a reasonable royalty, the jury was instructed as follows:

Plaintiffs are entitled to a reasonable royalty for all infringing sales proven by Plaintiffs in this case.

. . .

A royalty is a payment made to the owner of a patent by a non-owner in exchange for rights to make, use, or sell the claimed invention. A reasonable royalty is the royalty that would have resulted from a willing, hypothetical negotiation between plaintiffs and a company in the position of the defendants taking place just before the infringement began. You should also assume that both parties to that negotiation understood the patent to be valid and infringed and that the licensee would respect the patent and were willing to enter into a license.

In determining the value of a reasonable royalty, you may consider evidence on any of the following factors:

1. Any royalties received by plaintiffs for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

2. The rates paid by the defendants to license other patents comparable to the '109 patent.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of its

territory or with respect to whom the manufactured product may be sold.

4. Plaintiffs' established policy and marketing program to maintain his right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

5. The commercial relationship between the licensor and the licensee, such as whether or not they are competitors in the same territory in the same line of business.

6. The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such collateral sales.

7. The duration of the '109 patent and the term of the license.

8. The established profitability of the product made under the '109 patent; its commercial success; and its current popularity.

9. The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the Defendants has made use of the invention; and any evidence that shows the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented

features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as plaintiffs) and a licensee (such as the defendants) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

16. Any other economic factors that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

. . . plaintiff may use the "entire market value rule," which allows for the recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is patented, when the patentee can normally anticipate the sale of the unpatented features with the patented feature; that is, the feature patented constitutes the predominant basis for consumer demand of the unpatented features.

If the unpatented feature does not constitute the predominant basis for consumer demand, the damage award must be adjusted to account for the value that the unpatented features contribute.

You may exclude from such determination the economic value properly attributable to the prior art and to other features and improvements of the infringing product, whether or not such other features are themselves patented, that contribute economic value to the infringing product.

(Tr. 5/21/07 at pp. 57-61).

**E.**

**1.**

As to willfulness, the jury was instructed as follows:

> When a person becomes aware that a patent may have relevance to his or her activities, that person has a duty to exercise due care and investigate whether or not his or her activities or proposed activities infringe any valid, enforceable claim of the patent.  If that person did not do this and is found to have infringed the patent claims, then the infringement was willful.
>
> . . .
>
> . . . To establish willful infringement, plaintiffs must prove two things by the highly probable standard.  First, plaintiffs must prove that defendants were aware of the '109 patent.  Second, plaintiffs must prove that defendants proceeded with the infringing activities without a good faith belief that the patent was either invalid, not infringed, or both.
>
> In determining whether or not defendants acted in good faith, you should consider all of the circumstances, including whether or not defendants obtained and followed the advice of a competent lawyer.  Although the absence of a lawyer's opinion does not require you to find willfulness, the obtaining and following of a lawyer's advice may be evidence that infringement was not willful.
>
> In evaluating defendants' reliance on the advice of a lawyer, you should consider when defendants obtained the advice, the quality of the information defendants provided to the lawyer, the competence of the lawyer's opinion, and whether or not defendants relied upon the advice.  Advice is competent if it was based upon a reasonable examination of the facts and law relating to validity and/or infringement issues, consistent with the standards and practices generally followed by competent lawyers.
>
> Another factor you should consider in determining willfulness is whether or not, in designing the product or process accused of infringement, defendants copied the disclosures of the 109 patent.  Evidence of copying a patent is evidence of willful infringement.

The fact that it has been determined that defendant [sic] were wrong and that the '109 patent is infringed does not mean that defendants' infringement was willful. All that is required to avoid a finding of willful infringement is that defendants had a good faith belief that it did not infringe or that the patent was invalid, and that defendants' belief was reasonable under all of the circumstances.

An initial rejection by the Patent and Trademark Office of original claims that later were confirmed on reexamination does not necessarily justify a good faith belief in the invalidity of the claims.

Id. at 61-3.

## 2.

In discussing willful infringement, another commentator states:

The infringers' intent and reasonable beliefs are the primary focus of a willful infringement inquiry. When a potential infringer has actual notice of the patent rights of another, he or she has an affirmative duty of due care to avoid infringing that patent. The primary consideration is whether the infringer had sound reason to believe that he or she had the right to act in the manner that was later found to be infringing.

Herbert F. Schwartz, Patent Law and Practice, §8.IV.A. (5th ed.) (footnotes omitted).

Harmon, supra at §17.4 says this on willfulness:

For a finding of willful infringement, it must appear that the infringer had no reasonable basis for believing it had a right to do the acts in question. The test is whether, under all the circumstances, a reasonable person would prudently conduct himself or herself with any confidence that a court might hold the patent invalid or not infringed. There must be an honest doubt of infringement or validity.

Harmon also says:

. . . a party cannot be found to have willfully infringed a patent of which the party had no knowledge. Nor is there a universal rule that to avoid willfulness one must cease manufacture of a product immediately upon learning of a

patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit.  Exercising due care, a party may continue to manufacture and may present what in good faith it believes to be a legitimate defense without risk of being found on that basis alone a willful infringer.

Id. at § 17.4(b).

## IV.  Reasonable Royalty

The testimony of Overbaugh, Sundance's damages expert, was not challenged either in cross-examination by DeMonte or in DeMonte's defense in its case in chief. Overbaugh's Georgia- Pacific analysis (Px 136) amply supports the jury's finding that five percent (5%) was a reasonable royalty rate.  His analysis coupled with the testimony of Merlot and Nanci fully support the jury's finding that the entire market rule should be applied to the infringing sales of the Quick Draw™ system.  The jury could have reasonably concluded that it was more likely than not the patented features of the Quick Draw™ system were novel and that its segmented cover moved customer demand and that the other components of the Quick Draw™ system were of a secondary consideration so far as customer preference was concerned.  Particularly, there was substantial evidence in the record to support the following facts:

- The invention of the '109 patent was a significant advance in tarpaulin covers for flat bed trailers;

- Segmentation is important to buyers of covers for flat bed trailers.  Among other things, it makes field installation easier and results in lower maintenance costs;

- The unpatented components of the Quick Draw™ system function together with the patented components to produce a desired end product;

- The prior unitary tarpaulin sold by DeMonte and others was replaced by sales of the Quick Draw™ system. Customers no longer buy the unitary tarpaulin.

Two additional considerations emphasize the validity of the jury's finding that the entire market rule was applicable and there is substantial evidence in the record supporting Overbaugh's royalty analysis.

First, Px 143 is a Quick Draw™ system brochure from its website. The brochure reads, in part:

> SECTIONAL TARPS
>
> Quick Draw's unique design gives the appearance of a seamless one-piece tarp, however, separate pieces of tarp material are used between each bow. Sectional tarps help to eliminate costly downtime. If the tarp becomes torn beyond patching, only the damaged section needs replacing. This can be done within a few hours for thousands less than the cost of replacing a one-piece tarp. This is a standard feature of Quick Draw!

DeMonte's defense to Sundance's case on damages was limited to attempting to persuade the jury that the segmented tarpaulin lacks novelty and that the invention of the '109 patent was a marginal improvement in a crowded art. This assertion is belied by its own marketing material.

Second, in final argument DeMonte argued that its total sales of infringing Quick Draw™ systems was $16,127,100,[4] that the infringing components represented only one percent (1%) of the sales price of a Quick Draw™ system, and that a reasonable

---

[4]Now DeMonte's makes only a modest challenge to the total sales testified by Overbaugh - fifty less.

royalty rate was between two and a half-percent (2.5%) and four percent (4%).

DeMonte then went on to argue (Tr. 5/21/07 at p. 34):

> So we are asking you to write in to question A either .025 or
> .04, whichever you feel is a better result, a more reasonable
> royalty rate, and we think when you do that math you are not
> going to give these folks $1.6 million, you are not going to
> give them $2 million. You are going to give them about
> $4,000. That's what we think it's worth. $4,000 at 2.5 or
> $6,450 at 4 percent. We think that's all that it's worth.

DeMonte in its opening brief at p. 8 phrased it somewhat differently:

> The jury verdict is the product of a 5% royalty rate multiplied
> by a base for sales revenues of $23,288,934.00. For the
> reasons set out above, the court should grant the following
> relief:
>
> 1) As to the Inflated Base. The evidence shows the total
> sales revenues were overstated by 50 of the 1998 Quick
> Draw™ systems. At an estimated $15,000 a unit for 50 unit
> this reduces the base to $22,538,934.00. Further, the
> evidence shows that the value of the segmentation feature to
> the remaining units was no more than 1% of the total sales
> revenues. Therefore the evidence supports a judgment of
> no more than 5% x (1% of $22,538,934 or $225,389) =
> $11,269.
>
> 2) As to the Improper Royalty Rate. The evidence shows a
> reasonable rate for a royalty is no more than 2.5%.
> Consequently, the evidence supports a judgment of no more
> than 2.5% x $225,389 = $5,635.
>
> Consequently, the court should grant Defendants' motion
> and reduce the amount of the judgment to $5,635.
> Alternatively, the court should grant Defendants' motion for a
> new trial on damages.

To argue to the jury and now to the Court, both validity and infringement having

been established, that DeMonte's liability for infringement is at most $6,450 borders on

the frivolous. This line of argument enhances the proofs of Sundance at trial and

particularly Overbaugh's opinion as to what constitutes a reasonable royalty.

The jury's verdict on the amount of infringing sales and a reasonable royalty is consistent with the instructions. There is no good reason for disturbing the jury's verdict that there were $23,288,934 in infringing sales and that a reasonable royalty on these sales is five percent (5%).

## V. Willfulness

### A.

Whether or not DeMonte's infringement of the '109 patent was willful as found by the jury presents a substantially more complex question than was the question of what constitutes a reasonable royalty and the sales base to which the royalty rate applies.

Sundance justifies the jury's findings of willfulness on the basis of a jury finding the following facts by the highly probable standard:

- DeMonte began the manufacture of segmented tarpaulins after seeing a segmented tarpaulin at Detroit Tarp, Inc. in 1993. The segmented tarpaulin manufactured by Detroit Tarp, Inc. for Sundance and was the cover of a dump truck.

- In 1993, DeMonte saw a Sundance brochure picturing a segmented tarpaulin on a dump truck with the words "patent pending."

- DeMonte began the manufacture and sale of segmented tarpaulins in 1993.

- DeMonte in 1999 heard about Sundance's lawsuit with Aero Industries, Inc., which involved a claim of infringement of the '109 patent.

- Sundance sued DeMonte for infringement of the '109 patent in December

17

2001.  (The suit was dismissed on jurisdictional grounds.  This case was filed on September 4, 2002.)

- While Sundance obtained a legal opinion shortly after the Pennsylvania case was filed that the '109 patent was invalid in March 2002 and in April 2002 saw a draft of a letter to DeMonte (which was never sent) which stated that the Quick Draw™ system did not infringe, these opinions were by a Canadian lawyer not expert in United States patent law.

- DeMonte continued to manufacture and sell the Quick Draw™ system until at least January 23, 2007.  Between 2002 and 2007, the U.S. Patent and Trademark Office twice reexamined the '109 patent and twice found it valid.

Sundance says that the jury could reasonably have concluded that DeMonte's conduct was culpable, and that DeMonte breached the affirmative duty of due care not to infringe.  Sundance also says that DeMonte's post-trial argument that the case was a close one, true or not, does not detract from its culpable conduct.

**B.**

Sundance is wrong.  First, as noted, Sundance ignores the highly probable standard required for proof of willfulness.  The facts that DeMonte saw a segmented tarpaulin at Detroit Tarp, Inc., saw a brochure with the words "patent pending," and heard of the Aero Industries lawsuit are neither probative nor determinative of willfulness.  Culpable conduct is measured from the point in time a putative infringer has actual knowledge of an issued patent and not before.  Seeing a brochure with the words "patent pending" is insufficient.  The precedents from the Federal Circuit support this

18

finding.  In <u>Conopco, Inc. v. May Dep't Stores Co.</u>, 46 F.3d 1556, 1562 (Fed. Cir. 1994)

the Federal Circuit stated:

> [i]n resolving the willfulness, enhanced damages, exceptional case, and
> attorney fees issues, the court is cautioned not to place undue weight on
> defendants' activities prior to the issuance of the patent.  Although these
> activities may have been undertaken with knowledge that a patent
> application covering the relaunched lotion formulation was pending (in
> view of the "patent pending" notice affixed to the relaunched product), that
> is insufficient to support a finding of willfulness.

(citations omitted).  It is clear that "[t]o wilfully infringe a patent, the patent must exist

and one must have actual knowledge of it."  <u>State Industries, Inc. v. A.O. Smith Corp.</u>,

751 F.2d 1226, 1236 (Fed. Cir. 1985).  DeMonte knew of the '109 patent and that

Sundance claimed infringement only with the filing of the Pennsylvania lawsuit in

December 2001 and not before.

As for copying, there are substantial differences between what DeMonte saw at

Detroit Tarp, Inc. and the Sundance brochure and the design of the Quick Draw™

system.  The jury could not reasonably have found applying the highly probable

standard that DeMonte copied Sundance's commercial embodiment of the '109 patent.

The legal opinion that DeMonte received that the '109 patent was invalid and the

draft opinion it saw stating that the Quick Draw™ system did not infringe, while written

by Canadian counsel, was such that DeMonte could have reasonably relied on them.

These was nothing in evidence to support the assertion that the Canadian lawyer lacked

the competence to express the opinions he did.  As stated in <u>Ortho Pharmaceutical</u>

<u>Corp. v. Smith</u>, 959 F.2d 936, 944 (Fed. Cir. 1992):

> [C]ounsel's opinion must be thorough enough, as combined
> with other factors, to instill a belief in the infringer that a court
> might reasonably hold the patent is invalid, not infringed, or

unenforceable.

DeMonte vigorously defended the case both on the validity issue and on the infringement issue. The fact that DeMonte continued to manufacture and sell the Quick Draw™ system as the case progressed is not evidence of willfulness. During the course of the this case, twice DeMonte went to the U.S. Patent and Trademark Office in an effort to have the '109 patent rejected on grounds of obviousness and twice the U.S. Patent and Trademark Office went through the reexamination process. Indeed, the Court in its MEMORANDUM AND ORDER GRANTING DEFENDANT'S RENEWED MOTION TO STAY PROCEEDINGS AND GRANTING PLAINTIFFS' MOTION TO AMEND entered September 2, 2004 stated:

> . . . it does not appear that DeMonte's renewed request for a stay has a dilatory tactical motive behind it. DeMonte raised the issue of validity in its first responsive pleading and thereafter. The USPTO's recent decision lends credence to its position that the '109 patent is invalid.

Perhaps most significantly, this was a close case – so close that were the Court not to overturn the jury's finding of willfulness, it is likely it would deny enhanced damages and attorneys' fees. See Modine Mfg. Co. v. Allen Group, Inc., 917 F.2d 538, 543 (Fed. Cir. 1990)[5] (noting that a finding of willfulness "merely authorizes, but does not mandate, an award of increased damages.") (emphasis in original). See also Cybor Corp. v. FAS Tech., Inc., 138 F.3d 1448, 1461 (Fed. Cir. 1998) (recognizing same).

Lastly, when the Court compares the facts in this case to a case in which the

---

[3]On reflection, the Court should have dealt substantively with Defendants' Motion in Limine to Remove the Issue of Willfulness from Jury Consideration, filed April 26, 2007. Re-reading these motion papers satisfies the Court that the issue of willfulness should never have been put to the jury.

Federal Circuit upheld the Court's finding of willful infringement, <u>Bott v. Four Star Corp.</u>, 807 F.2d 1567 (Fed. Cir. 1986), satisfies the Court that the rejection of the jury's finding of willfulness is appropriate.

## VI. Conclusion

Accordingly, for the reasons stated above, DeMonte's motion for judgment as a matter of law on the reasonable royalty issue is DENIED, and its motion for judgment as a matter of law on willfulness issue is GRANTED. The jury's finding of willfulness is SET ASIDE.

In light of this decision, Sundance's Motion for Enhanced Damages Due to Willfulness is DENIED AS MOOT.

SO ORDERED.


     s/Avern Cohn                    
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated: August 1, 2007


I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, August 1, 2007, by electronic and/or ordinary mail.


     s/Julie Owens                    
Case Manager, (313) 234-5160